UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| LATRISHA WINDER, INDIVIDUALLY, AS NEXT FRIEND OF J.W., A MINOR, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STEPHEN WAYNE WINDER, DECEASED, LILY WINDER, STEPHEN TYLER WINDER, EMMA WINDER, AND LOU ANNE PHILLIPS | § § § § § § § § § § § | |
| PLAINTIFFS | § § | No. _____ |
| v. | § § | |
| UNITED STATES OF AMERICA | § § | |
| DEFENDANT | § § | |

# COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

This civil action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, for a U.S. Army Chaplain's negligence that was a proximate cause of the shooting death of Steve Winder and caused injuries to his wife and children and to his mother-in-law Lou Anne Phillips, who was standing next to Steve when he was shot.

## I.    JURISDICTION AND VENUE

1.    This court has subject matter jurisdiction of this civil action under 18 U.S.C. § 1346(b)(1).

2.     In accordance with 28 U.S.C. § 2675(a), the claims set forth in this Complaint were presented to the Department of the Army on June 22, 2023. On December 1, 2023, the Department of the Army denied the claims of Latrisha Winder, individually and as the Personal Representative (as Dependent Administrator) of the Estate of Stephen Wayne Winder, Deceased, Lily Winder, Stephen Tyler Winder, and Emma Winder. On February 14, 2024, the Department of the Army denied the claims of Latrisha Winder, as the next friend of J.W., a minor, and Lou Anne Phillips.

3.     Venue is proper in this district under 28 U.S.C. § 1402(b) because all the plaintiffs reside in Young County, Texas, and a substantial part of the acts or omissions complained of occurred in Young County, Texas. Young County is in the Wichita Falls Division of the Northern District of Texas. 28 U.S.C. § 124(a)(6).

## II.     PARTIES

4.     Plaintiff Latrisha Winder is a resident of Young County, Texas, the wife and widow of Stephen W. Winder, the Personal Representative (as Dependent Administrator) of the Estate of Stephen Wayne Winder, Deceased, and the parent and next friend of J.W., her and Steve's minor daughter. The Estate of Stephen Wayne Winder, Deceased, is pending in Young County, Texas.

5.     Plaintiff Lily Winder is a resident of Young County, Texas and the daughter of Steve Winder.

6.     Plaintiff Stephen Tyler Winder is a resident of Young County, Texas and the son of Steve Winder.

7.    Plaintiff Emma Winder is a resident of Young County, Texas and the daughter of Steve Winder.

8.    Defendant United States of America is served (A) by either delivering a copy of the Summons and of the Complaint to Leigha Simonton, the United States Attorney for the Northern District of Texas—or to an assistant United States Attorney for the Northern District of Texas or a clerical employee whom the United States Attorney for the Northern District of Texas has designated in a writing filed with the Clerk of the Northern District of Texas—or by sending a copy of the Summons and of the Complaint by registered or certified mail to the civil-process clerk at the office of United States Attorney for the Northern District of Texas; and (B) by sending a copy of the Summons and of the Complaint by registered or certified mail to Merrick Garland, the Attorney General of the United States, at Washington, D.C. FED. R. CIV. P. 4(i).

## III.    STATEMENT OF FACTS

A.    The Winders

9.    In June 2021, at age 39, Steve Winder was a successful auto mechanic. He was employed full-time at an annual salary of $100,000. Steve and Latrisha had married in 2013, and their daughter J.W. was born in 2014. Steve had three children from his first marriage: two daughters, Lily and Emma Winder, and a son, Stephen Tyler Winder.

10.    Steve, Latrisha, and J.W. lived in rural Young County, Texas near Graham on approximately nine acres of land. They had a pool, and Latrisha's mother

Lou Anne Phillips lived in a house next to Steve and Latrisha's house. In June 2021, Emma was living with Steve. Latrisha's sister Vickie Burleson and Vickie's daughter Breanna Lackey lived across the road from the Winders.

11.    Steve had a history of depression. During his first marriage, Steve threatened suicide and received treatment for depression. In June 2021, Steve was believed to be taking Prozac for depression. His post-mortem toxicology report was positive for Prozac.

B.    Sunday afternoon, June 27, 2021

12.    On Sunday, June 27, 2021, Latrisha was at Fort Lee, Virginia for Advanced Individual Training. Latrisha, who had previously been in the military, had recently joined the United States Army National Guard and was an E-4 Specialist. She had last been home in March 2021 and had last seen Steve in person on June 3, 2021 in Virginia.

13.    On Sunday afternoon, Steve, some family members, and relatives were swimming in the Winders' pool. Steve was drinking that afternoon. Steve accidentally got in the pool with his cellphone, so he went inside, found and charged Latrisha's old cellphone, and found Facebook messages between Latrisha and her ex-husband whom she had divorced in 2001. Latrisha's ex-husband had started sending Facebook messages to Latrisha in 2019 about wanting to get back together with Latrisha, but she declined. Latrisha, however, had not told Steve about these messages.

14.    Around 4:00 PM, Steve went to Lou Anne's house and, appearing upset, asked her to look at the messages on Latrisha's old cellphone. Lou Anne reviewed the

messages and pointed out to Steve that, while Latrisha should not have been messaging with her ex-husband, her messages did not indicate a desire to get back together with him. Steve agreed with Lou Anne and then went back to his house.

15.     Concerned, Lou Anne went to Steve's house to check on him. Steve asked to use Lou Anne's cellphone to call Latrisha, and Lou Anne left the bedroom while Steve and Latrisha talked. Steve accused Latrisha of infidelity in the phone conversation and later in text messages. After that phone conversation, Steve asked Lou Anne to take J.W. with her to Lou Anne's house, which Lou Anne did.

16.     Back at her house, Lou Anne started receiving texts from Latrisha about Latrisha's concern for Steve because she could not reach him. Latrisha then called Lou Anne, saying that she was worried about Steve because of his history of drinking too much and mental illness. Lou Anne went to Steve's house to check on him again and then returned home.

C.     Army Chaplain Keven Johnson-Glassel

17.     The Army Chaplain Corps "is a special branch of the Army whose mission is to provide for the comprehensive religious support to the Army across the spectrum of operations." *Chaplain Corps*, § 39-1.a. (June 1, 2017). Chaplain (Capt.) Keven Johnson-Glassel was a Chaplain in the United States Army Chaplain Corps. Latrisha later learned that Chaplain Johnson-Glassel had been a lawyer; he has reported on social media that he received his J.D. from Hamline University School of Law in 2000.

18.     Army Chaplains receive extensive training in suicide prevention and intervention for both service-members and their families. According to a June 1, 2017 Army Chaplain Corps document, Army Chaplains "must" "[u]nderstand the elements of suicide awareness and prevention." *Chaplain Corps*, § 39-2.c.(3) (June 1, 2017). According to the December 2015 report of the Treatment Advocacy Center in Washington D.C., a minimum of one in four of all fatal police encounters involves the death of a person with severe mental illness. At this rate, the risk of being killed during a police encounter is sixteen times greater for persons with untreated mental illness than for members of the general population.

19.     The *Covenant and Code of Ethics for Chaplains of the Armed Forces* provides in part:

- "I will hold in confidence any privileged communication received by me during the conduct of my ministry. I will not disclose confidential communications in private or in public."

- "I recognize the power afforded me by my ministerial office. I will never use that power in ways that violate the personhood of another human being, religiously, emotionally, or sexually."

20.     Army Regulation AR 165-1, § 16-2, provides:

a. *Confidential communications*. Confidential communication is any communication given to a chaplain by an individual, to include enemy prisoners of war, if such communication is made either as a formal act of religion or as a matter of conscience. A communication is "confidential" if made to a chaplain in the chaplain's capacity as a spiritual advisor or to a religious affairs specialist in his or her official capacity and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication.

    b. *General rule of privilege.* A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a chaplain or religious affairs specialist, if such communication is made either as a formal act of religion or as a matter of conscience.

21.    Under Military Rule of Evidence 503, a "person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman …, if such communication is made either as a formal act of religion or as a matter of conscience." MIL. R. EVID. 503. "A communication is "confidential" if made to a clergyman in the clergyman's capacity as a spiritual adviser … and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication." MIL. R. EVID. 503.

22.    A September 2020 presentation by Chaplain (Lt. Col.) Valeria Van Dress, Command Chaplain of the Command Chaplain Section of the U.S. Army Medical Center for Excellence, on the topic of confidential communications between U.S. Army Unit Ministry Team Members and their military constituents, states in part:

- Confidentiality is Absolute:  NO STATED EXCEPTIONS

- Confidentiality applies to statements made to Chaplains, Religious Affairs Specialists, and anyone working for a Chaplain (e.g. Chapel Secretaries or other support staff.)

- Reveal info ONLY when:

  o <u>written</u> consent given

- <u>Until you know Otherwise</u>, ASSUME that the person:

- o   Considered this to be a matter of religion or conscience, and

- o   He/She intends this to be confidential

- Remember,

  - o   it is <u>his/her intention</u>, not your theology, that determines whether this is confidential or not.

  - o   This is also <u>not a lawyer's</u> call.  Do not speak even if a lawyer suggests that it isn't confidential

- Unless you are absolutely sure something is not confidential,

  <u>Do Not Speak.</u>

  Here are general guidelines:

  1) In general, assume that the person communicating something to you believes this to be spiritual and protected.  Remember that it is his/her intention that determines the extent of privilege.

  2) Much damage has been done in the past when Chaplains have leaked to Commanders or other persons information that a Soldier or family member thought was confidential.  Don't you make this mistake.  Until you are absolutely sure that information is NOT protected ( best case, get the person to tell you it isn't protected and sign the same)  Do not divulge anything.

## Exceptions

- <u>Person Voluntarily Waives</u> Confidentiality

  - Not Coerced

  - Normally:  Signed, dated and witnessed

  - Must be given AFTER the information is shared (no Pre-counseling "Informed Consent")
    …

  - <u>No Other Exceptions</u>:  Confidentiality is <u>Absolute</u>

- Even in scary situations (abuse, child abuse, threats to self or others) Do Not Break Confidentiality.

The ONLY true exception to the veil of confidentiality is when the person specifically instructs you to reveal. You should normally get this in writing.

For example:

    1) A Soldier applying to be a conscientious objector ASKS you to write a letter supporting his case. If he asks, go ahead and write/speak.

    2) A Soldier asks you to help him get help when he is feeling like hurting himself. He asks, we help.

There are NO other exceptions: Even in scary situations. In situations where you are worried about a Soldiers' or someone else's safety, there are Many things you can do, like stay with the Soldier, get them to safety, persuade them to get help. But we don't break the Soldier's privilege without permission.

Special Situations
Follow-Up Actions

- If anyone is in immediate danger, do everything possible to immediately lower the risk of harm to others or the individual.

- Contact your chaplain supervisor for advice.

- Contact the Family Life Chaplain.

- Encourage the individual to take appropriate actions to resolve the situation.

- But: Even in Scary Situations, DO NOT Break Confidentiality Without Waiver

D.    Latrisha meets with Chaplain Johnson-Glassel

23.    In addition to Steve's accusation of infidelity, in the early evening, Latrisha received texts from Steve with photos of Steve with a handgun under his chin and to his head and stating that he could not bear it anymore. Distraught over Steve's infidelity accusation and apparent suicide threat, Latrisha went to her sergeant and asked to see a chaplain. Latrisha wanted to speak to a chaplain for both spiritual and secular advice about Steve's accusations and apparent suicide threat.

24.    Chaplain Johnson-Glassel came to Latrisha's barracks, and they privately met in a meeting room. Latrisha explained what was going on to Chaplain Johnson-Glassel. For his help in addressing her spiritual needs for Steve's accusation that she had been unfaithful, Latrisha showed Chaplain Johnson-Glassel the messages with her ex-husband, and he counseled her spiritually. Regarding Steve's apparent suicide threat, Chaplain Johnson-Glassel told Latrisha that she should call local law enforcement and ask them to do a welfare check on Steve.

25.    Around 7:00 PM, Latrisha made a Facetime call to her mother Lou Anne with Chaplain Johnson-Glassel also on the call. In that call, Latrisha told Lou Anne that Steve had texted her a photo of himself with a gun and that the chaplain wanted her to call law enforcement to request that they do a welfare check on Steve. Latrisha told Lou Anne and Chaplain Johnson-Glassel that she did not think it was a good idea to have law enforcement check on Steve, and Lou Anne told Chaplain Johnson-Glassel and Latrisha that doing so would "not bode well." In response, Chaplain Johnson-Glassel told Latrisha that he would call law enforcement if she did not call.

With this coercion, Latrisha called the Young County Sheriff's Office against her wishes to ask for a welfare check on Steve.

26.     After her Facetime call with Latrisha, Lou Anne went again to Steve's house and into his bedroom to talk to him. Steve was in his chair in the bedroom corner that was opposite the corner where the bedroom door was. Lou Anne sat on the end of the bed to talk to Steve and noticed that his handgun was tucked between the bed's sideboard and mattress. Steve lawfully possessed this gun, having a constitutional right under the Second Amendment to possess a gun in his home. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Lou Anne and Steve talked again about Latrisha's messaging with her ex-husband, how it was wrong but that everyone makes mistakes, and that Steve could forgive her. They also talked about how Steve knew that Latrisha loved him, and, choking up and crying, Steve talked about how much he loved Latrisha and that she was his "world." At that point, Lou Anne called her other daughter Vickie. Vickie's daughter Breanna answered, and Lou Anne told her to tell Vickie to go to Lou Anne's house to be with six-year-old J.W. Vickie and Breanna went to Lou Anne's house.

E.     The Shooting

27.     Meanwhile, in her call to the Young County Sheriff's Office, Latrisha asked them to do a welfare check on Steve because he had sent her photos of himself with a gun to his head. In her call, Latrisha did not allege or report that Steve had committed or was going to commit a crime; she asked only that they "check on" Steve. In Latrisha's call, she gave the dispatcher Steve's phone number, but his number

apparently was not passed on to the officers so that they could contact him by phone before attempting to confront him in person.

28.     Rookie Sheriff's Deputy Joshua Gallardo, who was twenty-three years old, and Sheriff's Deputy Simon Dwyer, an experienced peace officer for seventeen years, were partners that evening and eating dinner at Taco Casa in Graham. Before becoming a licensed peace officer, Deputy Gallardo first was a jailer for the Wichita County Sheriff's Office for approximately four and one-half years. The Wichita County Sheriff's Office performance evaluations for Deputy Gallardo reflect that his judgment and decision-making were poor, as was his knowledge of methods and procedures—they did not meet expectations and improvement was needed.

29.     After attending the Police Academy at Vernon College in 2019-2020 and becoming a licensed Texas peace officer on July 1, 2020, Deputy Gallardo's first job was as a Sheriff's Deputy with the Ochiltree County Sheriff's Office in Perryton, Texas. While on probationary status, and after only approximately three months, Deputy Gallardo was either fired or was asked to resign after an incident involving his poor judgment while on duty guarding a hospitalized jail inmate. Deputy Gallardo's employment history also includes being fired by Wal-Mart. After separating from the Ochiltree County Sheriff's Office in October 2020, Deputy Gallardo was hired by the Young County Sheriff's Office and started on November 2, 2020.

30.     Deputies Gallardo and Dwyer were dispatched to the Winder home to check on Steve for a possible suicide attempt. The dispatcher noted to the deputies

that Steve "does have a gun" and a little later that the reporting party (Latrisha) had said that her husband had sent her a photo of himself holding a gun and told her that he could not bear this anymore. Deputy Gallardo had finished his meal and left for the Winder residence in response to the dispatch before Deputy Dwyer, who finished his meal, cleaned off their table, and then left for the Winder residence.

31.    Deputy Gallardo and Deputy Dwyer drove separate patrol vehicles to the Winder home, with Deputy Gallardo arriving several minutes before Deputy Dwyer. Deputy Gallardo approached the Winder home without displaying any urgency. After exiting his patrol vehicle, Deputy Gallardo turned on his body cam and casually walked approximately 100 feet to the back of the Winder home and knocked on the back door. Again showing no urgency, Deputy Gallardo waited for approximately thirty seconds, and no one came to the back door. Deputy Gallardo then casually walked to the right between the Winder home and Lou Anne's home, calling out "hello" twice. He then walked toward the front of Lou Anne's home, where he encountered nineteen-year-old Breanna, Steve's niece, at Lou Anne's carport. Deputy Gallardo asked Breanna if Steve was there, and Breanna said that he was but pointed at the Winder home. Deputy Gallardo said that he needed to talk to Steve. Deputy Gallardo did not express any urgency to her or identify an ongoing emergency.

32.    Showing no urgency or alarm herself, Breanna first started to walk toward the Winder home with Deputy Gallardo but then turned, said she was going to get her mother, and went back toward Lou Anne's front porch to tell her mother Vickie that a police officer was there and wanted to talk to Steve. Again showing no

urgency, Deputy Gallardo waited on Breanna to return, with approximately forty seconds passing after he first encountered Breanna before Breanna began to walk Deputy Gallardo to the Winder home a second time. As Breanna was returning to Deputy Gallardo, Dispatch notified him by radio that the caller's mother "*may* be on the property trying to make contact with the husband."

33.     Meanwhile, Vickie called her mother Lou Anne to tell her that a police officer was there, wanted to talk to Steve, and was on his way over. Lou Anne, who was with Steve in his bedroom with the door closed, responded that she wished he would not come because she knew how Steve felt about his privacy and his private property.

34.     After returning to Deputy Gallardo, Breanna casually walked toward the Winder home, displaying no urgency, and Deputy Gallardo followed behind her, likewise displaying no urgency. Vickie had started following Deputy Gallardo and Breanna to the Winder home. She asked Deputy Gallardo how he was doing as he was approaching the Winders' front porch, and Deputy Gallardo casually replied, "Good." It took Breanna and Deputy Gallardo thirty-two seconds to walk from Lou Anne's home to the Winders' front door.

35.     When Breanna and Deputy Gallardo got to the porch steps, Breanna stopped, motioned for Deputy Gallardo to go ahead and said, "Go ahead." But Deputy Gallardo, again appearing at ease with the situation and displaying no urgency, casually motioned to Breanna to go ahead and said, "If you wanna just open the door." Breanna approached the front door and, refusing to open the door, knocked instead.

A muffled loud voice could be heard inside the house, and Breanna, appearing uncomfortable and pausing to try to hear inside, stepped away from the door. Breanna then told Deputy Gallardo, "They're coming to the door … ." Deputy Gallardo replied, "Okay." Breanna left the porch, and Deputy Gallardo stood on the porch for twenty seconds. None of Deputy Gallardo's and Breanna's conversation or body language indicated any urgency.

36.    While Deputy Gallardo and Breanna were talking outside Lou Anne's home and then walking over to the Winder home, Lou Anne, after being called by Vickie and told that the police officer was coming over, told Steve that she wanted to take Steve's gun and put it under the bed because a police officer was coming over. This made Steve upset, and he responded along the lines of: "I don't give a [expletive]. This is my home." This is apparently the loud, muffled talking that could be heard from the porch.

37.    Lou Anne and Steve could hear someone at the front door even though Steve's bedroom door was closed. Lou Anne, who was still sitting on the end of Steve's bed, got up to go to the front door and told Steve that it was probably the police officer. Steve said to Lou Anne loudly and with an upset tone something like, "what the, this is my home" and grabbed his gun from the side of the bed. Lou Anne walked toward the bedroom door after seeing Steve pick up his gun and get out of his chair.

38.    Instead of waiting for Deputy Dwyer, his experienced partner, to arrive, and instead of attempting to contact the sergeant on duty—if one was even on duty— Deputy Gallardo opened the front door of the Winder home without knocking and

stood at the door's threshold. According to Lou Anne, at some point Deputy Gallardo made a small step on or into the threshold.

39.     Deputy Gallardo did not have a warrant to enter the Winder home, and based on everything that had transpired once Deputy Gallardo had arrived at the Winder property, there were no exigent circumstances for Deputy Gallardo to enter the Winder home without a warrant. Also, conducting a welfare check does not justify the warrantless entry of a home under the Fourth Amendment. *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (May 17, 2021).

40.     After opening the door, Deputy Gallardo said, "Hello, Sheriff's Office." Not getting a response, Deputy Gallardo said louder, "Steve." Steve yelled out, "What?" and Lou Anne simultaneously opened the bedroom door but was not initially visible on Deputy Gallardo's body cam because Deputy Gallardo was positioned partially behind the right side of the front door frame. Steve's bedroom door was approximately eight feet from the front door where Gallardo was standing. Lou Anne calmly said to Deputy Gallardo, "We're right here. Can I help you?" Deputy Gallardo asked what was going on, and Steve yelled to him from his bedroom, "Don't worry about it." Lou Anne calmly told Deputy Gallardo, "I'm talking to my son-in-law. He's upset right now but we're … right now," intending to communicate to Deputy Gallardo that they were all right.

41.     Around that point, Steve had gotten up from his chair with his gun and had begun walking toward the open bedroom door where Lou Anne was standing and talking to Deputy Gallardo. While looking at Steve after he had gotten up with his

gun and was rounding the far corner of the bed, Lou Anne told him, "Steve, put it up." This was the last time Lou Anne looked at Steve before he was shot. Steve again said loudly, "Don't worry about … [inaudible]."

42.     Deputy Gallardo then reached for his gun, and Lou Anne stopped looking at Steve and looked only at Deputy Gallardo when she noticed him reaching for his gun. Lou Anne was approximately seven feet from Gallardo. Also at that time, the following was heard on Deputy Gallardo's radio: "2318, I'm out." This was likely Deputy Dwyer announcing that he had arrived at the Winder property and was out of his patrol vehicle.

43.     Because Deputy Gallardo had reached for his gun and moved to his left, Lou Ann became visible on his body cam. Seeing Deputy Gallardo draw his gun, Lou Anne took a small step outside the bedroom with her eyes on Deputy Gallardo and said to Officer Gallardo while holding her right hand up to him in a gesture to stop, "He's got a gun." Steve was not visible on Deputy Gallardo's body cam. Because Lou Anne saw Deputy Gallardo raise his gun and point it toward her and the bedroom doorway, Lou Anne was watching only Deputy Gallardo and was not watching what Steve was doing beside and a little behind her when he got to the bedroom doorway.

44.     After Lou Anne had said, "He's got a gun," Deputy Gallardo said on his radio, "He's got a gun. He's got a gun." Steve was still not visible on Deputy Gallardo's body cam. Lou Anne then took another small step with her right hand up to Deputy Gallardo, continuing to gesture to him to stop and also obviously pleading to him to stop and back off, but almost all her words are inaudible because Deputy Gallardo

was talking at the same time, saying, "Put it down, man," and then yelling, "Put it down."

45.     After yelling "put it down" the second time, Deputy Gallardo fired one shot at Steve with his Glock 17 nine mm pistol while Steve was standing in the bedroom doorway next to and slightly behind Lou Anne but still not visible on Deputy Gallardo's body cam. Steve screamed out in pain, and Lou Anne screamed, "Oh, Dear God." Within four minutes of his arrival on the Winder property, Deputy Gallardo fatally shot Steve in his own home.

46.     Deputy Dwyer arrived on the Winder front porch approximately forty seconds after Deputy Gallardo shot Steve. After entering Steve's bedroom and examining the scene and Steve, who was then on the floor at the foot of the bed, Deputy Dwyer pointed at a gun on the far back corner of the bed (next to Steve's chair) opposite to where Steve was standing when he was shot and asked Deputy Gallardo if that was "the gun." Deputy Gallardo responded affirmatively.

47.     Deputy Dwyer left Deputy Gallardo in the bedroom with Steve to secure the rest of the house, closing the bedroom door behind him. Deputy Dwyer began talking with Lou Anne and then Vickie, saying to her, "I'm sorry I couldn't get here any quicker." Lou Anne approached Deputy Dwyer with Latrisha on her cellphone on Facetime, and Deputy Dwyer told Latrisha, "I apologize I couldn't have got here any quicker than I did."

48.     Deputy Dwyer then returned to Steve's bedroom to assist Deputy Gallardo with Steve, who was severely struggling because of his gunshot injuries, and

instructed Deputy Gallardo to secure Steve's gun. Deputy Gallardo picked up Steve's gun with his bare hands, removed the magazine and checked for a bullet in the chamber, and set the gun and the magazine on the chair. Deputy Gallardo then picked up Steve's gun and the magazine again with his bare hands and left the house and put them in his patrol vehicle.

49.     After Deputy Gallardo's unconstitutional entry into the Winder home, he unconstitutionally shot Steve in the upper right chest. The bullet's path was "in a front-to-back direction, medially and downwards." The bullet perforated Steve's heart and the lower lobe of his right lung. The bullet entered Steve's chest cavity through the third right anterior intercostal space and exited the chest cavity through the seventh right posterior intercostal space, lodging in the soft tissues of the right mid-back. The below image from Steve's autopsy report shows the bullet's entry wound in Steve's upper right chest:



50.     After Deputy Gallardo shot Steve, Lou Anne glanced at Steve and saw him turn around and go down to the bedroom floor on his hands and knees facing the nightstand to the left of the bed. Lou Anne did not see Steve's gun near him. In his

statement, Deputy Gallardo stated that, after firing one shot at Steve, "Steve fell backwards onto the floor into the bedroom, out of my sight."

51.     Very distraught and angry with Deputy Gallardo after he shot Steve, Lou Anne argued with him that he was out of control and looked at Steve again in the bedroom. She then turned around and yelled to Emma, who was in her bedroom, that her dad had been shot. Lou Anne then stepped toward Steve's bedroom to check on him, but Deputy Gallardo, now pointing his gun at her, ordered her to get back. Lou Anne backed away and, pointing to the bedroom, said, "He does not have a gun in his hand." After the shooting, Lou Anne did not see Steve holding the gun, moving toward the bed with the gun, or tossing the gun on the bed.

52.     Moreover, Lou Anne never saw Steve point his gun at Deputy Gallardo, but she initially believed that Steve was holding his gun in the bedroom doorway. Unlike Deputy Gallardo, Lou Anne did not get to consult with a lawyer and view the body cam video footage before being questioned about the shooting.

53.     Lou Anne initially believed that Steve was holding his gun in the bedroom doorway because she had looked at him while he was walking from his chair toward the doorway with it, she did not see him put it down, and he was holding it the last time she saw Steve before he was shot, which was as he was rounding the far corner of the bed when she said to him, "Steve, put it up." She also heard Deputy Gallardo twice say, "He's got a gun." Therefore, Lou Anne assumed that Steve was holding his gun when he was standing in the bedroom doorway. But based on information that she later learned from carefully reviewing Deputy Gallardo's and

Deputy Dwyer's body cam videos—specifically, the location of Steve's gun after the shooting—and realizing that, after saying, "Steve, put it up," her focus was solely on Deputy Gallardo because his gun was pointed toward her, Lou Anne believes that Steve put his gun on the bed when she told him to "put it up" and that he was neither holding the gun in the bedroom doorway nor pointing it at Deputy Gallardo when he was shot.

54.     Steve's bedroom measures approximately fifteen feet by fourteen feet, and the interior width of the bedroom door frame is approximately twenty-nine and one-half inches. The diagonal length of the bedroom's opposite corners is approximately twenty and one-half feet. The bed's mattress was king size, measuring approximately seventy-six inches by eighty inches.

55.     The following two post-shooting images from Deputy Dwyer's body cam show where Steve's gun, a Para 45-caliber pistol, was located once the officers entered his bedroom and until Deputy Gallardo picked it up to unload it and then took it outside.





56.    In these images, Steve's gun is lined up just next to two cellphones on the bed and next to his chair. The gun appears to have been carefully set down next to and lined up with the two cellphones. A third cellphone is on a notebook much closer to the foot of the bed.

57.    The below image depicts all three cellphones. Those three cellphones are believed to be Lou Anne's cellphone, Steve's cellphone that he had dropped in the pool, and Latrisha's old cellphone that Steve had started using that afternoon. The gun is apparent in this image. Steve's gun, a Para 1911 45-caliber pistol, weighs over three pounds fully loaded.



58.    The following lay floor plan (with the inserted furniture not being to scale) depicts Steve's location when he was shot and the gun's location after the shooting, as shown by the officers' body cams.



59.    When Steve was shot, he was approximately thirteen feet from where his gun was located after the shooting. According to both Lou Anne and Deputy Gallardo, after being shot, Steve went down to the floor. *If* Steve was holding his gun or pointing his gun at Deputy Gallardo when Deputy Gallardo shot Steve—a fact that Plaintiffs dispute—there is the critical question of how Steve's gun got on the bed thirteen feet away and lined up next to the cellphones.

60.    If Steve was holding his gun when he was shot, there appear to be three possibilities for how his gun got on the bed approximately thirteen feet away from where he was standing when he was shot. First, admittedly, Steve *possibly* could have flung it onto the bed right after he was shot and as he was going down onto the floor.

This possibility is highly improbable. Because Steve had just been shot through the heart and lung and was very intoxicated (with a blood-alcohol level of 0.173, just over twice the legal limit), it is almost unimaginable that Steve would have had the mental and physical ability or wherewithal to throw his gun approximately thirteen feet onto the bed and have it land perfectly next to the lined-up cellphones as if it had been carefully placed next to them. The fact that Lou Anne did not see Steve throw his gun after being shot makes this possibility even more improbable.

61.    The second possibility—that, after going to the floor, Steve got up on his knees or feet and tossed his gun onto the bed from a similar distance of approximately eight to ten feet—is also highly improbable for the same reasons as the first possibility.

62.    The third possibility is that, after being shot in the chest and going to the floor with his gun, Steve stood up with his gun, walked around the bed to the opposite corner of the bedroom holding his gun, and sat his gun on the bed next to the two cellphones in an apparently careful manner. Again, after Steve was shot, Lou Anne did not see Steve getting up off the floor or holding his gun. Given Steve's severe gunshot injuries and intoxication, it is highly improbable that he would have had the mental and physical ability or wherewithal to get on his feet and walk around the bed to carefully place the gun on the bed lined up next to the cellphones. Also, if Steve had done that, he likely would have either sat in his chair or gone back down to the floor on that side of the bed, but he did neither.

63.    The Texas Rangers of the Texas Department of Public Safety investigated Deputy Gallardo's shooting and killing Steve. The Texas Rangers report did not determine whether Deputy Gallardo's shooting and killing Steve was justified, nor did it determine whether Steve was holding a gun or pointing a gun at Deputy Gallardo when Steve was shot. The Texas Rangers' analysis of enhanced video from Deputy Gallardo's body cam could not identify that Steve was holding a gun.

64.    Furthermore, an expert forensic scientist tested Steve's gun for the presence of blood, and there is no blood on it. If Steve had been holding the gun when and after he was shot, including when he somehow would have been placing it on the bed after being shot in the heart, it is highly likely that his blood would be on the gun. The fact that there is no blood on Steve's gun makes it even more improbable that he was holding the gun when he was shot.

65.    Based on Steve's location when he was shot, Lou Anne's observations of Steve after he was shot, the location of his gun after he was shot, and the fact that there is no blood on the gun, it is implausible that Steve was holding his gun when Deputy Gallardo shot him. What is plausible and likely is that Steve put his gun down on the bed when Lou Anne told him to "put it up" and that Deputy Gallardo, who was an inexperienced twenty-three-year-old rookie sheriff's deputy with poor judgment in his law-enforcement work history and who had been told by Dispatch and then by Lou Anne that Steve had a gun, was unreasonably and fatally mistaken in thinking that Steve was holding a gun and pointing it at him when he shot Steve.

66.     On the day and evening of the shooting, Lou Anne spent significant time with her son-in-law Steve, talking with him about his accusation of Latrisha's infidelity, his emotional pain and anguish over it, and his suicidal threat. When Deputy Gallardo arrived at Steve's front door and opened it, Lou Anne was talking with Steve in his bedroom and came out to speak with Gallardo. Steve also got up and followed Lou Anne to his bedroom doorway, which is where he was standing when Gallardo shot him. Lou Anne was standing around seven feet away from and in front of Gallardo, and the bullet that fatally struck Steve appears to have traveled mere inches past Lou Anne, who was standing a foot or two from Steve.

67.     After the shooting, Latrisha met with Chaplain Johnson-Glassel again, and he apologized to her. If Chaplain Johnson-Glassel had not advised and coerced Latrisha into calling law enforcement to do the welfare check, Steve would not have been shot. Under all the circumstances that Chaplain Johnson-Glassel was aware of, it was reasonably foreseeable to him that having law enforcement confront Steve at that time and in his own home would create a dangerous situation for Steve and Lou Anne.

## IV.    CAUSE OF ACTION FOR NEGLIGENCE

68.     Plaintiffs Latrisha Winder, individually, as the Personal Representative (as Dependent Administrator) of the Estate of Stephen Wayne Winder, Deceased, and as next friend of J.W., Lily Winder, Stephen Tyler Winder, Emma Winder, and Lou Anne Phillips assert the following negligence cause of action under 28 U.S.C. § 2674.

69.     On the occasion in question, Chaplain Johnson-Glassel owed duties of care and confidentiality to Latrisha and duties of care to Steve and Lou Anne. Additionally, Chaplain Johnson-Glassel assumed duties of care to Latrisha, Lou Anne, and Steve by undertaking to render advice to Latrisha. Chaplain Johnson-Glassel also had a special relationship with Latrisha, Steve, and Lou Anne because he undertook the rendering of spiritual and secular services and advice to Latrisha, and he knew that his services and advice would also directly affect Steve and Lou Anne. Under these duties, Chaplain Johnson-Glassel was required to exercise reasonable care in rendering services and advice to Latrisha. In rendering these services and advice, Chaplain Johnson-Glassel was acting in the scope of his employment as a member of the United States Army Chaplain Corps and an employee of the United States, and liability would be imposed on the United States under Texas statutory and common law for Chaplain Johnson-Glassel's negligence if the United States were a private person.

70.     In rendering advice to Latrisha, Captain Johnson-Glassel breached his duties to Latrisha, Steve, and Lou Anne by advising and coercing Latrisha to call law enforcement to conduct a welfare check on Steve because his advice was unreasonable. Having law enforcement check on and necessarily confront Steve, who was mentally ill, drunk, emotionally disturbed, potentially suicidal, and armed, was unreasonable advice. Asking an armed law-enforcement officer to check on and necessarily confront a mentally ill, drunk, emotionally disturbed, potentially suicidal, and armed man in his own home was a reasonably foreseeable recipe for disaster.

Injecting an armed law-enforcement officer into the situation in Steve's home placed Steve at a high risk of being killed during this encounter and therefore also placed Lou Anne at a high risk of bystander injury because she was with Steve, for the risk of being killed during a police encounter is sixteen times greater for persons with untreated mental illness than it is for members of the general population. From the information that Chaplain Johnson-Glassel had received from Latrisha, as a trained Army Chaplain and as a lawyer or former lawyer, he knew or should have known that his advice to Latrisha to call law enforcement to check on Steve would create a high and grave risk of harm to Steve and Lou Anne. Chaplain Johnson-Glassel's advice and conduct were unreasonable and were a breach of his duty to exercise reasonable care under the circumstances.

71.    Under his duty of confidentiality to Latrisha and the applicable code of ethics in rendering spiritual advice, comfort, and guidance to Latrisha, Chaplain Johnson-Glassel owed Latrisha a duties of confidentiality and not to disclose her communications and a duty not to coerce her or misuse his chaplaincy power and authority in a way to violate Latrisha's personhood and rights by threatening to disclose her communications.

72.    Chaplain Johnson-Glassel breached his duties of care and confidentiality by engaging in one or more acts or omissions, singularly or in combination with others, constituting negligence, including the following:

- Chaplain Johnson-Glassel failed to give proper and reasonable advice to Latrisha and instead gave her improper and unreasonable advice to contact law enforcement and ask them to do a welfare check on Steve.

- Chaplain Johnson-Glassel failed to consider and choose a reasonable alternative such as speaking directly with Steve, having a local pastor speak with Steve, or having a local mental-health professional speak with Steve.

- Chaplain Johnson-Glassel failed to contact his supervisor for advice on the situation.

- Chaplain Johnson-Glassel wrongfully coerced Latrisha into calling the Young County's Sheriff's Office for a welfare check by threatening that he would call if she did not call. This was a wrongful threat to breach his duty of confidentiality to Latrisha and therefore an abuse and misuse of his chaplaincy power and authority.

73.    Chaplain Johnson-Glassel's breaches were a proximate cause of Steve's shooting death and Plaintiffs' injuries and damages. But for Chaplain Johnson-Glassel's negligent and coercive conduct and advice to Latrisha to call law enforcement, Steve would not have been killed by law enforcement and Lou Anne would not have witnessed it as a bystander. Chaplain Johnson-Glassel's negligent advice and conduct were a substantial factor in bringing about Steve's death and Plaintiffs' injuries and was a cause-in-fact of Steve's death and Plaintiffs' injuries. It was reasonably foreseeable that Chaplain Johnson-Glassel's negligent conduct and advice to Latrisha to call law enforcement would lead to Steve's fatal shooting and to Plaintiffs' injuries.

74.    Under Texas law, Lou Anne was a bystander and may recover mental anguish damages after witnessing her son-in-law being fatally shot just feet away from her and then having Deputy Gallardo point his gun at her—all because of Chaplain Johnson-Glassel's above-described negligence. Alternatively, under Virginia law (if applicable), Lou Anne may recover for negligent infliction of emotional

distress because Chaplain Johnson-Glassel's conduct created a special relationship with Latrisha, Steve, and Lou Anne, and Chaplain Johnson-Glassel therefore owed Lou Anne a duty of care. Chaplain Johnson-Glassel's above-described negligence inflicted emotional distress or disturbance on Lou Anne, who was in close proximity to Steve when he was fatally shot, and this emotional distress or disturbance caused Lou Anne to suffer mental anguish and physical injury because it aggravated her preexisting heart psoriasis conditions.

## V.    DAMAGES

75.    Plaintiffs sue to recover the following damages for the injuries and harm that were proximately caused by Chaplain Johnson-Glassel's above-described negligence:

   a.    Noneconomic damages (pain and mental anguish) for Steve Winder's injuries that he sustained before he died and the economic damages (medical expenses) incurred by his estate that were proximately caused by Defendant's negligence and that are recoverable by Plaintiff Latrisha Winder, as the Personal Representative of the Estate of Stephen Wayne Winder, Deceased, in the amount of at least $1,000,000;[1]

   b.    Economic and noneconomic damages of Plaintiffs Latrisha Winder, individually and as the next friend of J.W., Lily Winder,

---

[1] Tex. Civ. Prac. & Rem. Code § 71.021

Stephen Tyler Winder, and Emma Winder for their pecuniary loss, loss of companionship and society, and mental anguish that they have sustained in the past and will likely sustain in the future, and loss of inheritance arising out of Steve Winder's wrongful death and that were proximately caused by Defendant's negligence in the amount of at least $9,752,032[2]; and

c.    Lou Anne's noneconomic damages as a bystander for mental anguish and alternatively for mental anguish and physical injuries that were proximately caused by Defendant's negligent infliction of emotional distress in the amount of at least $1,000,000.

## VI.    PRAYER

76.    Plaintiffs pray that, upon final trial, Plaintiffs recover their actual damages and taxable costs.

Respectfully submitted,

CURNUTT & HAFER, L.L.P.

By: _/s/ Stephen W. Kotara_
     Douglas R. Hafer
     State Bar No. 00787614
     DHafer@CurnuttHafer.com

     Stephen W. Kotara
     State Bar No. 11693200
     SKotara@CurnuttHafer.com

---

[2] TEX. CIV. PRAC. & REM. CODE § 71.002.

301 West Abram Street
Arlington, Texas 76010
(817) 548-1000 - Telephone
(817) 548-1070 – Facsimile

*ATTORNEYS FOR PLAINTIFFS*