## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **LATRISHA WINDER, ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:24-CV-00083-O** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **Defendant.** | § | |

### OPINION & ORDER

Before the Court are Defendant's Motion to Dismiss (ECF No. 7), filed August 16, 2024; Plaintiffs' Response (ECF No. 14), filed October 7, 2024; and Defendant's Amended Reply (ECF No. 16), filed October 21, 2024. The Motion is ripe for this Court's review. For the reasons set forth herein, the Court **GRANTS** Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1).

## I.   BACKGROUND[1]

On June 27, 2021, Steve Winder ("Winder") and his family members were swimming in Winder's pool. Winder, who had been drinking, accidentally got into the pool with his cell phone. Winder went inside his home and charged an old phone that belonged to his wife Latrisha ("Latrisha"), who had recently joined the United States Army National Guard in Fort Lee, Virginia. Winder discovered Facebook messages on Latrisha's phone between Latrisha and her ex-husband. In the messages, Latrisha's ex-husband expressed a desire to reconcile with Latrisha. Latrisha declined her ex-husband's overture but never told Winder about these messages. Winder,

---

[1] Unless otherwise cited, the Court's recitation of the facts is taken from Plaintiffs' Complaint. *See* Pls.' Compl., ECF No. 1.

presumably upset about the messages, took Latrisha's phone next door to his mother-in-law's, Lou Anne Phillips ("Mrs. Phillips"), house. Mrs. Phillips pointed out that the messages indicated Latrisha did not want to get back together with her ex-husband. Winder agreed and went back to his house.

Later that day, Latrisha—who was in Virginia at the time—sent Mrs. Phillips text messages expressing concern for Winder because she could not reach him and because he had a history of excessive drinking and mental illness. Mrs. Phillips went to Winder's house to check on him and then returned home.

That same evening, Winder sent Latrisha text message photos of him "with a handgun under his chin and to his head."[2] Winder also sent text messages "stating that he could not bear it anymore."[3] Latrisha, distressed over Winder's infidelity accusation and apparent suicide threat, asked her sergeant if she could see an Army Chaplain. The Army Chaplain Corps "is a special branch of the Army whose mission is to provide for the comprehensive religious support to the Army across the spectrum of operations."[4] Army Chaplains are extensively trained "in suicide prevention and intervention for both service-members and their families."[5] Latrisha sought "both spiritual and secular advice about [Winder's] accusations and apparent suicide threat."[6]

Chaplain Keven Johnson-Glassel ("the Chaplain") met with Latrisha in a private meeting room. Concerning Winder's infidelity accusation, the Chaplain counseled Latrisha "spiritually."[7] As to Winder's apparent suicide threat, the Chaplain advised Latrisha to call local law enforcement and request them to conduct a welfare check on Winder.

---

[2] Pls.' Compl. ¶ 23, ECF No. 1.
[3] *Id.*
[4] *Id.* ¶ 17 (quoting *Chaplain Corps*, § 39-1.a. (June 1, 2017)).
[5] *Id.* ¶ 18.
[6] *Id.* ¶ 23.
[7] *Id.* ¶ 24.

At around 7:00 p.m. that night, Latrisha called Mrs. Phillips.  The Chaplain was also on the call.  Latrisha told Mrs. Phillips that Winder had sent her photos of a handgun under his chin and to his head, stating that "he could not bear it anymore."[8]  Latrisha also relayed to Mrs. Phillips that the Chaplain wanted her to have law enforcement do a welfare check on Winder.  Latrisha expressed to both Mrs. Phillips and the Chaplain "that she did not think it was a good idea to have law enforcement check on [Winder]."[9]  Mrs. Phillips agreed and told Latrisha and the Chaplain that a welfare check would "not bode well."[10]  The Chaplain responded that he would call law enforcement if Latrisha did not.  As a result, Latrisha called the Young County Sherriff's Office against her wishes and asked them to conduct a welfare check on Winder.  The dispatcher noted that Winder had a gun and had sent Latrisha a photo of himself holding the gun while saying "he could not bear it anymore."[11]

Young County Sheriff Deputies Joshua Gallardo ("Deputy Gallardo") and Simon Dwyer ("Deputy Dwyer") were dispatched to Winder's home.  Deputies Gallardo and Dwyer drove separate vehicles.  Deputy Gallardo arrived at the home first.  At this time, Mrs. Phillips was with Winder in his bedroom.  After realizing that Deputy Gallardo was outside the door, Mrs. Phillips tried to retrieve the gun from Winder.  But this upset Winder.  He responded "I don't give a [expletive].  This is my home."[12]

Deputy Gallardo opened the front door, announcing himself with "Hello, Sherriff's Office," and yelling for "Steve."[13]  Mrs. Phillips simultaneously opened the bedroom door, calmly

---

[8] *Id.* ¶ 23.
[9] *Id.* ¶ 25.
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 36 (alteration in original).
[13] *Id.* ¶ 40.

answered "We're right here. Can I help you?"[14]  Shortly thereafter, Mrs. Phillips saw Winder get up from his chair and walk toward the doorway with the gun. Mrs. Phillips told Winder to "put it up," and then told Deputy Gallardo, "He's got a gun."[15]  After this, Deputy Gallardo said on his radio, "He's got a gun. He's got a gun" and "Put it down, man. Put it down."[16]  Deputy Gallardo then fired one shot from his handgun that fatally hit Winder in the chest as he was standing next to the bedroom doorway.

Deputy Dwyer arrived on the front porch about forty seconds after Deputy Gallardo shot Winder. Deputy Dwyer spoke with Mrs. Phillips, who was on Facetime with Latrisha, and said, "I apologize I couldn't have got here any quicker than I did."[17]

On June 3, 2024, Latrisha, individually and as the Personal Representative of Winder's estate; Winder and Latrisha's four children; and Mrs. Phillips (collectively, "Plaintiffs") filed this action under the Federal Tort Claims Act ("FTCA") against Defendant United States of America. In their Complaint, Plaintiffs assert a single cause of action for negligence. Defendant filed a Motion to Dismiss Plaintiffs' Complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or, alternatively, for failure to state a claim under Rule 12(b)(6).[18]  Defendant's Motion is now ripe for the Court's review.

## II.    LEGAL STANDARD

Federal courts are courts of limited jurisdiction and must have "statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Generally, the party invoking jurisdiction bears the burden of

---

[14] *Id.*
[15] *Id.* ¶¶ 41, 43.
[16] *Id.* ¶ 44.
[17] *Id.* ¶ 47.
[18] Def.'s Mot. to Dismiss 2, ECF No. 7.

demonstrating that jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (explaining that the plaintiff "has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction"). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case." *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004).

Defendants may challenge a court's authority to hear a dispute under Federal Rules of Civil Procedure Rule 12(b)(1). *See* FED. R. CIV. P. 12(b)(1). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3). Courts may dismiss for lack of subject matter jurisdiction on any of three separate grounds: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) (internal quotation marks and citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Generally, when a Rule 12(b)(1) motion is brought with other Rule 12 motions to dismiss, the Rule 12(b)(1) motion must be addressed first. *See id.* ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

Thus, the Court analyzes Defendant's Rule 12(b)(1) Motion separately before analyzing Defendant's Rule 12(b)(6) Motion. Because the Court finds two of the three grounds for dismissal under Rule 12(b)(1) are meritorious, the Court does not analyze the other nor Defendant's Rule 12(b)(6) Motion.

## III.    ANALYSIS

In its Motion to Dismiss, Defendant advances numerous legal theories arising under Rule 12(b)(1), arguing the Court should dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.[19]   The Court only addresses Defendant's arguments relating to the ecclesiastical abstention doctrine and the *Feres* doctrine.

### A.    Ecclesiastical Abstention Doctrine

The first of Defendant's Rule 12(b)(1) arguments pertains to the ecclesiastical abstention doctrine.[20]  Specifically, Defendant contends that Plaintiffs' negligence cause of action focuses on clergy malpractice, which under Texas law[21] has been repeatedly rejected because it would require this Court's unconstitutional review of ecclesiastical matters.[22]  By contrast, Plaintiffs respond that the gravamen of their claim is that the Chaplain, "an Army officer trained in suicide prevention and intervention, undertook to provide *secular* advice to Latrisha about how to handle [Winder's] suicide threat and that he did so negligently."[23]  The Court agrees with Defendant.

"The First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships."  *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–36 (5th Cir. 1998).  "Instead, the Free Exercise Clause protects religious relationships, including the counseling relationship between a minister and his or her parishioner, primarily by preventing the judicial resolution of ecclesiastical disputes turning on matters of religious doctrine or practice."  *Id.* at 336 (internal quotation marks and citation omitted).

---

[19] *Id.* at 9–21.
[20] *Id.* at 9–12.
[21] In FTCA cases, federal courts apply "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The parties do not dispute that Texas law applies to this action.
[22] Def.'s Mot. to Dismiss 9–11, ECF No. 7.
[23] Pls.' Resp. to Def.'s Mot. to Dismiss 12, ECF No. 14 (emphasis added).

Under Texas law, "[t]he ecclesiastical abstention doctrine prohibits civil courts from delving into matters of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'"  *In re Lubbock*, 624 S.W.3d 506, 508–09 (Tex. 2021) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976)).  "The doctrine is grounded in the First Amendment, which protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  *Id.* at 509 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)).

"The First Amendment does not bar all claims against religious bodies, though."  *Id.* at 513. Indeed, "[a] court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government."  *Id.*  "In determining whether the ecclesiastical abstention doctrine applies, courts must analyze whether a particular dispute is 'ecclesiastical' or simply a civil law controversy in which [religious] officials happen to be involved."  *In re St. Thomas High Sch.*, 495 S.W.3d 500, 508 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (quoting *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 622 (Tex. App.—Houston [14th Dist.] 2015, pet. denied)).  "To resolve this issue, courts must look to the *substance and effect* of a plaintiff's complaint to determine its ecclesiastical implication."  *Shannon*, 476 S.W.3d at 622 (emphasis added).

Importantly, "any exception to ecclesiastical abstention by application of neutral principles must be *narrowly drawn* to avoid inhibiting the free exercise of religion or imposing secular interests on religious controversies."  *In re Lubbock*, 624 S.W.3d at 513 (emphasis added); *see also C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 398–99 (Tex. 2007) (explaining that "the

neutral-principles approach" has rarely been expanded beyond the church "property-ownership context"). "However, if the matter cannot be determined by the court without resolving a religious controversy," the doctrine does not apply. *Shannon*, 476 S.W.3d at 622.

Plaintiffs argue the Chaplain negligently undertook to provide *secular*, not religious, advice to Latrisha pertaining to Winder's alleged suicide threat, thus removing their negligence claim from the purview of the ecclesiastical abstention doctrine.[24] The "substance and effect" of Plaintiffs' Complaint demonstrates otherwise, though. *Id.* As a conclusion, the Complaint asserts that "Latrisha wanted to speak to a chaplain for both spiritual and *secular* advice about [Winder's] accusations and apparent suicide threat."[25] Plaintiffs fail to provide factual allegations however to substantiate their proposition that Latrisha's encounter with the Chaplain as to Winder's alleged suicide threat was not rooted in his religious beliefs.

The Complaint's only other reference to the Chaplain's alleged secular advice states, in a conclusory fashion, that the Chaplain "undertook the rendering of spiritual and *secular* services and advice to Latrisha."[26] Otherwise the Complaint's factual allegations make clear that the Chaplain was a "spiritual advisor"[27] to Latrisha and that during their interactions, the Chaplain "address[ed] [Latrisha's] spiritual needs"[28] and "counseled her spiritually."[29] Indeed, an Army Chaplain Corps document states that the mission of the Army Chaplain Corps "is to provide for the comprehensive *religious support* to the Army."[30]

---

[24] *Id.*
[25] Pls.' Compl. ¶ 23, ECF No. 1 (emphasis added).
[26] *Id.* ¶ 69 (emphasis added).
[27] *Id.* ¶ 20 (quoting Dep't of the Army, Army Regulation 165-1 § 16-2 (Mar. 5, 2024), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN32960-AR_165-1-000-WEB-1.pdf).
[28] *Id.* ¶ 24.
[29] *Id.*
[30] *Id.* ¶ 17 (emphasis added) (quoting *Chaplain Corps*, § 39-1.a. (June 1, 2017)).

In their Response, Plaintiffs explain that Army Chaplains are trained in suicide prevention, which they contend is secular in nature and cite to the Army's suicide training pamphlet.[31]  This suicide training pamphlet, though, explains that "Chaplains provide Family Life Ministry to Soldiers and Family Members to establish and maintain personal and *spiritual* health, and build or restore healthy relationships."[32]  It also instructs that a chaplain's purpose is to "[a]dvise commanders on *moral* and *ethical* issues and other stress factors that may result in an increased risk" for suicide.[33]  Tellingly, the pamphlet says, "Chaplains, chaplain assistants, and civilians who work in support of the Chaplain Corps provide comprehensive *religious* support services that are designed to enhance resilience and readiness."[34]

Contrary to Plaintiffs' argument, this action is not "simply a civil dispute in which a religious official happens to be involved."[35]  Based on the Complaint's allegations and its reference to Army regulations and training materials, Plaintiffs have failed to allege facts showing that this action "entails[] no inquiry into [the Chaplain's] religious doctrine."  *C.L. Westbrook, Jr.*, 231 S.W.3d at 399.

Plaintiffs cite three cases involving the ecclesiastical abstention doctrine, which they contend "illustrate that Plaintiffs' action is not barred."[36]  *See Sanders*, 134 F.3d 331; *McRaney v. N. Am. Mission Bd.*, 966 F.3d 346 (5th Cir. 2020); *C.L. Westbrook, Jr.*, 231 S.W.3d 389.  The Court disagrees.  In *Sanders*, the Fifth Circuit declined to apply the ecclesiastical abstention

---

[31] Pls.' Resp. to Def.'s Mot. to Dismiss 17, ECF No. 14 (citing Dep't of the Army, Health Promotion, Risk Reduction, and Suicide Prevention (Apr. 14, 2015), https://www.army.mil/e2/downloads/rv7/r2/policydocs/p600_24.pdf).

[32] Dep't of the Army, Health Promotion, Risk Reduction, and Suicide Prevention § 8-4 (Apr. 14, 2015), https://www.army.mil/e2/downloads/rv7/r2/policydocs/p600_24.pdf (emphasis added).

[33] *Id.* § 2-13 (emphasis added).

[34] *Id.* § 2-7 (emphasis added).

[35] Pls.' Resp. to Def.'s Mot. to Dismiss 17, ECF No. 14.

[36] *Id.* at 14–17.

doctrine to a sexual misconduct claim against a minister. 134 F.3d at 338. The court explained that because the minister "held himself out as possessing the education and experience of a professional marriage counselor" and "entered into a fiduciary relationship with the plaintiffs," the doctrine did not apply. *Id.* at 337. Moreover, the court determined "the activities complained of by the plaintiffs"—the minister's sexual misconduct—"were not part of his religious beliefs and practices." *Id.* at 338.

That is not the case here. The Army Chaplain Corps document mandates the Chaplain to provide "*religious* support."[37] Indeed, Latrisha specifically sought "spiritual" advice.[38] Plaintiffs and the Chaplain did not enter into a fiduciary relationship. And it is not obvious from the face of the Complaint that the Chaplain's advice regarding Winder's suicide threat was not rooted in his faith or religious doctrine.

Turning to *McRaney*, the Fifth Circuit there held it was too early in litigation to determine whether the plaintiff's allegations would "require the court to address purely ecclesiastical questions." 966 F.3d at 349. The court reasoned the plaintiff's "complaint ask[ed] the court to apply neutral principles of tort law to a case that, on the face of the complaint, involve[d] a civil rather than religious dispute." *Id.* Here, though, Plaintiffs' Complaint does not solely allege a secular civil dispute; instead, it describes a dispute grounded in the Chaplain's duty to provide religious support to service members. The Court acknowledges that Plaintiffs' Response contends they "are not suing for bad spiritual advice" but are instead suing for the Chaplain's "bad secular advice on handling [Winder's] suicide threat—advice that ended up getting [Winder] killed."[39] Plaintiffs rely however on the Complaint's conclusory statements that the Chaplain provided

---

[37] Pls.' Compl. ¶ 17, ECF No. 1 (emphasis added) (quoting *Chaplain Corps*, § 39-1.a. (June 1, 2017)).
[38] *Id.* ¶ 23.
[39] Pls.' Resp. to Def.'s Mot. to Dismiss 17, ECF No. 14.

purely secular advice as to Winder's suicide threat and fail to substantiate this proposition with factual allegations. Instead, the Complaint's factual allegations indicate the Chaplain's interactions with Latrisha, including his suicide advice, was rooted in his religious duties.

Finally, in *C.L. Westbrook, Jr.*, the Texas Supreme Court applied the ecclesiastical abstention doctrine to the plaintiff's numerous claims, including defamation and negligence, against the defendant pastor. 231 S.W.3d at 391–92. The plaintiff urged the court not to apply the doctrine because it should "not shield a licensed professional counselor from liability that arises from a secular counseling relationship simply because scripture might occasionally be discussed." *Id.* at 396. The plaintiff argued it was the defendant pastor's breach of a secular duty of confidentiality that caused her injury. *Id.* at 398. To that end, the plaintiff contended that for the court to decide "whether [defendant] breached a secular duty of confidentiality as a licensed professional counselor would not, according to [the plaintiff], require resolution of a theological matter." *Id.* The Texas Supreme Court rejected this argument. It reasoned it could be "theoretically true" that a court could determine whether the defendant "breached a secular duty of confidentiality without having to resolve a theological question." *Id.* at 397. But this inquiry would not answer whether "doing so would unconstitutionally impede the church's authority to manage its own affairs." *Id.*

And such is the case here. Plaintiffs argue the Chaplain threatened to breach his duty of confidentiality by telling Latrisha "he would call law enforcement if she did not call,"[40] which they contend "is wholly secular and a neutral principle that the Court can apply without inquiring into and applying [the Chaplain's] religious training, faith, and beliefs."[41] To support this argument,

---

[40] Pls.' Compl. ¶ 25, ECF No. 1
[41] Pls.' Resp. to Def.'s Mot. to Dismiss 18, ECF No. 14.

Plaintiffs cite Army regulations detailing a Chaplain's duty of confidentiality.[42]   But those regulations say that "[a] communication is 'confidential' if made to a chaplain in the chaplain's capacity as a *spiritual advisor*."[43]   And the Complaint explicitly states the Chaplain counseled Latrisha "spiritually."[44]   Accordingly, Plaintiffs have pled no facts describing a secular encounter with the Chaplain.

Plaintiffs even admit "the only evidentiary component of Plaintiffs' negligence claim that touches on *religion* is [the Chaplain's] duty of confidentiality that he threatened to breach to coerce Latrisha."[45]   The existence of this tension—whether the Chaplain's duty of confidentiality is religious or secular in nature—is precisely why free exercise principles mandate the Court abstain from adjudication here.   Indeed, "[i]t is a core tenet of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of" religious doctrine.  *Id.* at 397.  It is not for the Court to adjudicate, or even question, the Chaplain's duty of confidentiality, given that Plaintiffs have admitted, and Army regulations make clear, there is a religious component to this inquiry.

The plaintiff in *C.L. Westbrook, Jr.* also urged the Texas Supreme Court "to apply the neutral-principles approach to her professional-negligence claim, contending her claim [could] be resolved under neutral tort principles without resorting to or infringing upon religious doctrine." *Id.* at 399.  Again, the court rejected the plaintiff's argument.  It acknowledged that the plaintiff "pin[ned] [the defendant's] liability in this case, at least in part, on his breach of a secular duty."

---

[42] *Id.* at 17–18 (citing Dep't of the Army, Army Regulation 165-1 § 16-2 (Mar. 5, 2024), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN32960-AR_165-1-000-WEB-1.pdf); Pls.' Compl. ¶ 20, ECF No. 1 (citing Dep't of the Army, Army Regulation 165-1 § 16-2 (Mar. 5, 2024), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN32960-AR_165-1-000-WEB-1.pdf).
[43] Dep't of the Army, Army Regulation 165-1 § 16-2 (Mar. 5, 2024), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN32960-AR_165-1-000-WEB-1.pdf.
[44] Pls.' Compl. ¶ 24, ECF No. 1.
[45] Pls.' Resp. to Def.'s Mot. to Dismiss 17, ECF No. 14 (emphasis added).

*Id.* at 400. But the court held this alleged breach could not be determined "without examining what effect the imposition of damages would have on the inherently religious function of church discipline." *Id.* A significant component of Plaintiffs' negligence claim here is the Chaplain's threatened breach of his duty of confidentiality to Latrisha.[46] Because there is no doubt the facts included in the Complaint show the Chaplain serves an inherently religious function within the Army,[47] imposing damages in this case, like in *C.L. Westbrook, Jr.*, would impinge on the Chaplain's religious function and ability to counsel spiritually. *See id.* ("[W]hile the elements of [the plaintiff's] professional-negligence claim can be *defined* by neutral principles without regard to religion, the *application* of those principles . . . would impinge upon [the church's] ability to manage its internal affairs." (emphasis in original)).

Plaintiffs attempt to distinguish the court's reasoning in *C.L. Westbrook, Jr.* by arguing that the Chaplain "owed Latrisha a duty of confidentiality, but he owed no one a religious obligation to disclose [Winder's] suicide threat."[48] The Texas Supreme Court, though, cautioned that "[i]f civil courts undertake to resolve essentially religious controversies, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern . . ." *Id.* (alteration in original) (internal quotation marks and citation omitted). The Court cannot attempt to navigate the hazards implicated in the instant case.

---

[46] Pls.' Compl. ¶ 72, ECF No. 1 (The Chaplain committed "a wrongful threat to breach his duty of confidentiality to Latrisha and therefore an abuse and misuse of his chaplaincy power and authority.").

[47] *Id.* ¶ 17 ("The Army Chaplain Corps 'is a special branch of the Army whose mission is to provide for the comprehensive religious support to the Army across the spectrum of operations.'" (quoting *Chaplain Corps*, § 39-1.a. (June 1, 2017))).

[48] Pls.' Resp. to Def.'s Mot. to Dismiss 16, ECF No. 14.

In sum, the Court concludes the ecclesiastical abstention doctrine applies to Plaintiffs' negligence cause of action. Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiff's Complaint for lack of subject matter jurisdiction on this ground.[49]

### B.    The *Feres* Doctrine

Defendant also argues the Court lacks subject matter jurisdiction over this action under the *Feres* doctrine, which bars suits based on accidents incident to military service.[50] Plaintiffs respond the doctrine does not apply because Latrisha and her family members suffered injuries that are derived solely from Winder's death.[51] Plaintiffs' arguments fail; the Court agrees with Defendant.

"The United States may be sued only to the extent that it waives its sovereign immunity." *Davis v. United States*, 961 F.2d 53, 56 (5th Cir. 1991). The United States through the FTCA "waive[s] its sovereign immunity in certain specified classes of tort claims." *Id.* But the Supreme Court has held that the FTCA's waiver does not extend to "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146 (1950). This is known as the *Feres* Doctrine, and in the Fifth Circuit, it "bars all lawsuits based on injuries incident to military service." *Morris v. Thompson*, 852 F.3d 416, 420 (5th Cir. 2017). This includes state law claims and suits brought by military family members. *Id.*; *United States v. Johnson*, 481 U.S. 681, 687–88 (1987). "Claims barred under the *Feres* doctrine

---

[49] The Fifth Circuit has stated "it is somewhat unclear whether the ecclesiastical abstention doctrine serves as a jurisdictional bar requiring dismissal under Fed. R. Civ. P. 12(b)(1) or an affirmative defense requiring dismissal under Fed. R. Civ. P. 12(b)(6)." *McRaney*, 966 F.3d at 348 n.1. The court declined to "resolve this uncertainty." *Id.* The Court construes the doctrine's application here as a Rule 12(b)(1) jurisdictional bar.

[50] Def.'s Mot. to Dismiss 15–21, ECF No. 7.

[51] Pls.' Resp. to Def.'s Mot. to Dismiss 22–24, ECF No. 14.

14

are appropriately dismissed for want of jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Chandler v. United States*, 713 F. App'x 251, 253 (5th Cir. 2017).

To determine whether an injury was incident to military service, courts in this circuit consider: "(1) the duty status of the service member; (2) the place where the injury occurred; and (3) the activity in which the service member was engaged at the time of the injury." *Morris*, 852 F.3d at 421.

The Court first examines whether the *Feres* doctrine bars Latrisha's claims. There is no dispute Latrisha maintained active-duty status during all relevant events alleged in the Complaint.[52] And she suffered an injury to her personhood as a result of the Chaplain's threatened breach of his duty of confidentiality to her while she was on base in Fort Lee, Virginia.[53] Finally, Latrisha was engaged in conversations with the Chaplain—seeking his religious counseling and advice—when her injuries took place. Though this may be what Defendant acknowledges as, "a personal, non-military, matter," it does not preclude application of the *Feres* doctrine.[54] Tellingly, Latrisha "was both on active duty status and on the premises of the [Army base] at the time of the accident." *Mason v. United States*, 568 F.2d 1135, 1136 (5th Cir. 1978). And "[w]hile on active duty and on the base, [Latrisha] was still subject to all military regulations and discipline and was readily available for emergency service or temporary duties." *Id.* Indeed, it was the military that employed the Chaplain and because of her military status, Latrisha could take advantage of his services. Consequently, the Court concludes the *Feres* doctrine applies to Latrisha because the injury to her personhood caused by the Chaplain's threatened breach of his duty of confidentiality was incident to military service, thereby barring her claims in this action. *See id.*

---

[52] Pls.' Compl. ¶ 12, ECF No. 1.
[53] *Id.* ¶¶ 12, 24, 71, 73.
[54] Def.'s Mot. to Dismiss 16, ECF No. 7.

Now, the Court considers whether the family members' claims are also barred.  Plaintiffs specifically contend Mrs. Phillips's bystander injury, Winder's survival injuries, and the wrongful-death injuries of Winder's children are not derivative of Latrisha's in-service injury.  And, by their logic, the *Feres* doctrine would not preclude their claims.  The Court is not persuaded.

Courts have broadened the *Feres* doctrine and "have widely ruled that FTCA relief is *not* available to family members for claims based on the injuries to their relatives in the armed forces." *Gaspard v. United States*, 713 F.2d 1097, 1102 (5th Cir. 1983) (emphasis added) (collecting cases). "This is true even when the claims of the family members are independent of the serviceman's cause of action under applicable state law," such as here.  *Id.*  The Fifth Circuit has clarified that if "a *crucial* element" of the family members' claim "is the in-service injury inflicted on" the service member, their claims "*must*" be barred under the *Feres* doctrine.  *Id.* (emphasis added). The broad reach of this doctrine stems from "the need to avoid the *inquiry* into military orders, and not the *consequences* of the inquiry, that justifies the military exclusion from the FTCA."  *Id.* (emphasis in original).

The Court concludes the family members' claims here are barred under the *Feres* doctrine. Plaintiffs contend that under the "genesis test," the family members' claims are not derivative of Latrisha's in-service injury.[55]  The Court rejects this argument.  "[T]he genesis test asks whether the civilian injury has its origin in an incident-to-service injury to a service member." *Ortiz v. United States ex rel. Evans Army Cmty. Hosp.*, 786 F.3d 817, 824 (10th Cir. 2015).  If so, "then *Feres* applies as a bar to the third-party claim, just as it would to a claim by the service member for his or her injuries."  *Id.*  Tellingly, a "clear-cut application of the genesis test occurs when the relative of a service member sues for loss of consortium or mental anguish when the government

---

[55] *Id.* at 21–22.

negligently causes the service member's death or *injury*." *Id.* at 825 (emphasis added). To be clear, "these claims are 'ancillary or derivative to an injury to a serviceman incident to military service' and thus cannot proceed under *Feres*." *Id.* (quoting *Lombard v. United States*, 690 F.2d 215, 226 (D.C. Cir. 1982)); *see also Duncan v. Peters*, 190 F.3d 538 (5th Cir. 1999) (explaining that when "the military act[s] toward the service member but cause[s] injury to the service member's dependents[,]" *Feres* doctrine bars the claim).

Here, the family members' injuries, including those for pecuniary loss, loss of companionship, and mental anguish,[56] had their genesis in Latrisha's in-service injury.[57] Indeed, the "crucial element" of their claims involves and stems from the Chaplain's threatened breach of his duty of confidentiality which injured Latrisha's personhood.[58] *Gaspard*, 713 F.2d at 1102; *see also Ortiz*, 786 F.3d at 831 ("When we weigh all of the competing evidence, and view it in the light most favorable to plaintiff, we find that the injuries that [the service member's child] sustained forming the basis of the complaint are derivative of the injuries to her mother, [the service member].").

In sum, the Court concludes the claims of every Plaintiff in this action are barred under the *Feres* doctrine. The Court thus **GRANTS** Defendant's Motion to Dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction on this ground.

## IV.    CONCLUSION

For the reasons explained, the Court **GRANTS** Defendant's Motion to Dismiss under Rule 12(b)(1). Accordingly, the Court **DISMISSES** this action without prejudice. Separate final judgment shall issue from the date of this Order.

---

[56] Pls.' Compl. ¶ 75, ECF No. 1.
[57] *Id.* ¶ 73 (The Chaplain's "breaches were a proximate cause of [Winder's] shooting death and Plaintiffs' injuries and damages.").
[58] *Id.* ¶ 71.

**SO ORDERED** on this **17th day** of **January, 2025**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE